UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GEORGE ELLIS WALLACE,

Plaintiff,

v.

C. E. DUCART, et al.,

Defendants.

Case No. 16-cv-03798-SI

**ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANTS**

Re: Dkt. No. 33

This is a *pro se* prisoner's civil rights action under 42 U.S.C. § 1983 in which George Ellis Wallace alleges that several defendants discriminated against him based on his religion. Defendants now move for summary judgment on the merits of Wallace's claims and on their defense of qualified immunity, as well as on the ground that Wallace did not exhaust administrative remedies for his claims against several defendants. Wallace opposes the motion. For the reasons discussed below, defendants' motion for summary judgment will be granted and judgment will be entered in their favor.

**BACKGROUND**

A.    The Claims Alleged And Procedural History Of The Case

Wallace alleged in his amended complaint that, because they perceived him to be a Muslim, correctional officer (C/O) Richards fired Wallace from his job in the prison kitchen, C/O Ramirez confiscated his television and moved him to a different part of the prison, and C/O Gutierrez threatened to harm him.

This action was originally assigned to Magistrate Judge Jacqueline Scott Corley. Magistrate Judge Corley determined that, liberally construed, the *pro se* amended complaint stated

cognizable claims for violations of Wallace's First Amendment right to the free exercise of his religious beliefs and his rights under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1. Other claims and defendants were dismissed. *See* Docket No. 25.

Although plaintiff and some defendants consented to proceed before a magistrate judge, other defendants were dismissed from the action and the dismissed defendants had not consented to proceed before a magistrate judge. This action was reassigned to the undersigned after the Ninth Circuit issued *Williams v. King*, 875 F.3d 500, 503 (9th Cir. 2017), which held that all named parties, including unserved defendants, must consent before a magistrate judge has jurisdiction under 28 U.S.C. § 636(c)(1) to hear and decide a case. The court then issued an order explaining to the parties why the action had been reassigned from a magistrate judge to a district judge, describing the limits on a magistrate judge's authority when there was not full consent, and giving the parties an opportunity to object to any of the magistrate judge's earlier rulings. Docket No. 42 at 1-2. The court further informed the parties that, once it received any objections and responses thereto, it would "'determine de novo any part of the magistrate judge's disposition that has been properly objected to.'" *Id.* at 2 (quoting Fed. R. Civ. P. 72(b)(3)). No party objected to any of the magistrate judge's rulings.

Notwithstanding the absence of any objection to the magistrate judge's rulings, the court noted that there was a cognizable equal protection claim pled in the amended complaint, even though the claim had not been mentioned in the earlier orders. "Specifically, plaintiff's allegations that the defendants discriminated against him based on his religion, liberally construed, state[d] a cognizable claim for a violation of his right to equal protection." Docket No. 44 at 2, citing Docket No. 21 at 10 (alleging that plaintiff was fired "from [his] job unjust[ly] because of [his] religious belief," and suffered other wrongs because of his religious beliefs). The court thus adopted the magistrate judge's rulings with the modification that there was a cognizable equal protection claim in addition to the earlier-identified claims for violations of Wallace's First Amendment right to the free exercise of his religion and for a violation of Wallace's rights under RLUIPA. *Id.* The court then permitted the parties to address the equal protection claim via supplemental briefing on the pending motion for summary judgment. *Id.* at 3. Only defendants

filed a supplemental brief.

B.    Claim Against C/O Richards[1]

The following facts are undisputed unless otherwise noted:

The events and omissions giving rise to the complaint occurred in 2015 at Pelican Bay State Prison.

At the relevant time, C/O Richards was assigned to Facility A-3, general population. He supervised a team of ten inmate-workers in the kitchen, responsible for feeding up to 400 inmates on a daily basis. He also was responsible for the sanitation of the kitchen, tracking inmates' records, and maintaining time sheets. Docket No. 33-1 at 1-2.

Wallace was hired by C/O Richards to work in the dining room in Facility A-3. *Id.* at 2. Wallace worked in the dining room for nine months, from September 3, 2014, through June 8, 2015. Docket No. 34 at 8; Docket No. 33-1 at 2, 3. Wallace worked an early-morning shift and was supervised by C/O Richards. The parties appear to disagree whether that shift ended at about 9:00 a.m. (Wallace's version) or 11:30 a.m. (Richards' version), but the time when the shift ended is not material to the present dispute. According to Wallace, all the workers on the morning shift left work at 9:00 a.m. Docket No. 34 at 9.

The parties disagree about Wallace's specific job duties. Wallace states that he "was never a culinary worker" and was only a "dining room scullery worker." Docket No. 34 at 8. His job did not entail serving food to inmates on the line. *Id.* Instead, he "clean[ed] all the pots after the inmates on line empty them into the trays and they send the trays out to other blocks." *Id.*[2]

_____

[1] As will be explained later in the order, the claims against all defendants except C/O Richards must be dismissed because administrative remedies were not exhausted for those claims. The claims against C/O Richards are the only claims that will be addressed on the merits, and therefore are the only claims for which a detailed recitation of facts is warranted.

[2] C/O Richards declares that Wallace was hired as a dining room worker whose "job responsibilities included serving food, sanitizing the kitchen, and sometimes preparing lunches." Docket No. 33-1 at 2. At the summary judgment stage, the court accepts as true the nonmoving party's evidence when there is a dispute. Here, that means the court accepts Wallace's version, i.e., that his job entailed only cleaning pots.

United States District Court
Northern District of California

The parties disagree about whether C/O Richards ever mentioned religion to Wallace. According to Wallace, C/O Richards inquired on an unspecified date whether Wallace was a Muslim. Docket No. 21 at 5; Docket No. 34 at 10. Wallace responded that he was "all religions in one." Docket No. 34 at 10. Also according to Wallace, C/O Richards stated to Wallace in this conversation that he (Richards) and other officers were being trained with books taken from an inmate -- an inmate who turned out to be Wallace's cellmate. When Wallace asked Richards what the books were, Richards said, "Dojo in the way of peace. It was a way to deal with the inmates better." Docket No. 34 at 10; *see also* Docket No. 21 at 5. Wallace does not explain how the Dojo book embodied or was connected to any religion.[3] Other than to ask on this one occasion whether Wallace was a Muslim, there is no evidence that C/O Richards ever mentioned religion.

Wallace states that, on an unspecified date, C/O Richards spread a rumor that Wallace "was rolling it off the yard, which means that a person is about [to] snitch on another inmate or he fears for his life by other inmates in which he then rolls it off the yard." Docket No. 21 at 5. Wallace states that, by saying Wallace was "going to roll it off the yard," Richards put Wallace "in danger with other inmates." *Id.* Wallace does not identify the person to whom Richards allegedly spread the rumor. Wallace also provides no evidence that Richards communicated the rumor to any inmate, that any inmate ever became aware of the rumor, or that any inmate ever acted on the rumor.

C/O Richards recalls the event differently, and states that a control booth officer informed him that Wallace was "'rolled up,'" which means "that an inmate is moved to administrative-segregation housing for disciplinary reasons." Docket No. 33-1 at 2. C/O Richards understood the information to mean that Wallace had been removed from his kitchen job and moved to

---

[3] C/O Richards denies that he ever asked Wallace's religion and states that he did not know of Wallace's religion until he read Wallace's complaint in this case. C/O Richards further states: "If I ever asked him about his religion, I would have done so to make sure that his religious practices could be accommodated while at work. Muslim inmates, for example, have in the past brought their prayer rugs to the kitchen to perform prayers at sunrise. . . . I never observed Wallace engage in any religious practice during the performance of his kitchen duties." Docket No. 33-1 at 5. C/O Richards further denies discussing religion or any books that might have been confiscated from Wallace's cell. *Id.*

administrative segregation. *Id.* It turned out that the control booth officer was mistaken about the inmate's identity, and it was another inmate -- not Wallace -- who had been moved to administrative segregation. *Id.* C/O Richards further states: "Wallace became aware of this exchange between me and the control booth officer, and perceived it as an attempt on my part to spread rumors about him 'rolling it off the yard,' which means snitching. I personally explained to Wallace that he misunderstood the content of the conversation between me and the control booth officer, and that I never discussed anything related to snitching." *Id.* at 2-3.

On June 8, 2015, C/O Richards prepared a form CDC 128-B1 "notice of classification hearing" pertaining to Wallace. Docket No. 21 at 14-15. The CDC 128-B1 stated that Wallace would appear before a classification committee for consideration of a program change, specifically "unassignment from culinary" program. *Id.* at 14. C/O Richards wrote the following as reasons for the proposed program change: "Inmate Wallace is unable to perform his daily duties in a timely manner. His effort displayed in assigned tasks and duties is unacceptable and creates more work for his co-workers, which creates an unstable work environment. He doesn't work well among other inmates. I recommend he be unassigned from A3 dining a.m. crew." *Id.* at 14-15.[4]

In his declaration, C/O Richards provides a more detailed discussion of his reasons for recommending Wallace's termination. According to Richards, Wallace's job performance was poor, and he did not appear to improve over the last few months of his assignment, even though C/O Richards had verbally counseled him on several occasions. Docket No. 33-1 at 3. Wallace did not perform his daily duties in a timely manner and displayed poor effort in the tasks assigned to him. *Id.* This type of work performance could disrupt prison operations or affect the food preparation. *Id.* Wallace also had "solitary behavior" that C/O Richards thought "was not an appropriate fit in an environment where teamwork is necessary for the completion of tasks." *Id.* at 4. Wallace's inability to perform his tasks created additional work for his co-workers, who "repeatedly complained to [C/O Richards] about the situation." *Id.* at 3. It appeared to C/O

United States District Court
Northern District of California

---

[4] Wallace states that the CDC 128-B1 was supposed to be typed rather than handwritten, according to a staff member. Docket No. 34 at 7. Any dispute about whether the form was supposed to be handwritten or typed is immaterial to the merits of Wallace's § 1983 claim.

Richards that other inmates were irritated with Wallace's behaviors; Richards was concerned that workplace conflicts could erupt into violence if not properly addressed. *Id.* C/O Richards noted that inmates in the kitchen had access to tools and kitchenware that could be used as weapons, and stated: "Based on my twenty years of experience and on my observations of Wallace, as well as the mannerisms and complaints of other inmates working in the kitchen, I recommended that Wallace be unassigned from the kitchen to ensure inmate and institutional safety." *Id.* at 4. C/O Richards also states that he did not issue disciplinary reports because his intent was not to punish Wallace, and instead he "simply wanted him to be reassigned to a work assignment more suitable to him, if available." *Id.* at 5. C/O Richards declares that he did not remove Wallace from the kitchen job for any religion-related reason. *Id.*

Technically, C/O Richards did not fire Wallace: C/O Richards did not have the power to remove Wallace from the job, and only could recommend that Wallace be unassigned. *Id.* at 4. The CDC 128-B1 prepared by C/O Richards was sent to the classification committee. The classification committee held a hearing with Wallace present on June 25, 2015, at which time the classification committee acted on the recommendation. *See* Docket No. 33-1 at 16. The classification committee "unassigned" Wallace from the kitchen work assignment and "re-affirm[ed]" him for the waiting list to be a barber. *Id.* at 5, 16.

C.     Administrative Exhaustion Facts

The following facts are undisputed unless otherwise noted:

Wallace filed one inmate appeal pertaining to claims alleged in the amended complaint. Docket No. 21 at 9. That inmate appeal, submitted on July 26, 2015, was assigned log # PBSP-A-15-1851. *Id.* In that inmate appeal, Wallace complained that his "1, 4, 5, 8 and 14 Amend. Rights to the U.S. Const. were violated i.e. harassment, slander, prejudice, i.e., P.C. § 134." Docket No. 21 at 17. In the portion of the form where the inmate is directed to "explain [his] issue," Wallace stated that C/O Richards had not called him into work since June 9, 2015 "for no penological reason." *Id.* He explained that C/O Richards had "unassigned" him from the kitchen job and urged that the CDC 128-B1 Richards wrote to explain why he had requested that Wallace be

6

unassigned contained false statements and had procedural problems under prison regulations. Docket No. 21 at 19. Within his lengthy argument about the impropriety of his discharge from his kitchen job, Wallace wrote that, "because of my Universal Mystical Teachings, which is all religions in one I have been harass as being a Muslim by et. al P.B.S.P. staff as some kind of threat without any proof of this threat." Docket No. 21 at 19 (errors in source). The inmate appeal did not further describe this harassment, nor did it mention the name of any employee other than C/O Richards as a wrongdoer.

Wallace apparently attached to the inmate appeal the CDC 128-B1 that had been prepared by C/O Richards and three CDCR 22 form requests for "interview, item or service." *See* Docket No. 21 at 17, 21-24. The CDCR 22 form dated February 3, 2015, complained about Wallace's property being moved on January 31, 2015 and statements made by a correctional officer. Docket No. 21 at 22. The CDCR 22 form dated June 21, 2015, complained that unspecified staff member(s) interfered with his correspondence and he had not been called to work since June 9. Docket No. 21 at 23. The CDCR 22 form dated July 22, 2015, complained about the January 31, 2015, movement of his property and statements made by unspecified correctional officers. Wallace did not provide the names for any of the alleged wrongdoers in the CDCR 22 forms -- he identified them only as C/Os. Other than C/O Richards, the only person mentioned by name was Wallace's cellmate, William Brown.

The inmate appeal was denied at the first, second and third levels. *See* Docket No. 21 at 26-32. Each of those responses indicated that prison officials understood Wallace's grievance to be complaining about not being called into work by C/O Richards. The first-level response stated:

> APPEAL ISSUE: You allege that Correctional Officer F. Richards has not called you into work. All issues unrelated to the allegation of staff misconduct must be appealed separately and will not be addressed in this response. You do not exhaust administrative remedies on any unrelated issue not covered in this response or concerning any staff member not identified by you in this complaint. If you are unable to name all involved staff you may request assistance in establishing their identity.

Docket No. 21 at 26. In the portion of the inmate appeal form where the inmate may indicate his dissatisfaction with the resolution of his inmate appeal, Wallace did not provide the name of any correctional officer other than Richards, and did not indicate that the authors of the inmate appeal

7

responses had misperceived the substance of his inmate appeal. *See* Docket No. 21 at 18, 20 (§§ D, F).

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Generally, as when a defendant moves for summary judgment against plaintiff on the merits of the plaintiff's claims, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.

When a defendant moves for summary judgment on an affirmative defense on which he bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. *See Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992). The failure to exhaust administrative remedies is an affirmative defense that must be raised in a motion for summary judgment. *See Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc). On a motion for summary judgment for nonexhaustion, the defendant has the initial burden to prove "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." *Id.* at 1172. If the defendant carries that

burden, the "burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* The ultimate burden of proof remains with the defendant, however. *Id.* If material facts are disputed, summary judgment should be denied, and the "district judge rather than a jury should determine the facts" on the exhaustion question, *id.* at 1166, "in the same manner a judge rather than a jury decides disputed factual questions relevant to jurisdiction and venue," *id.* at 1170-71.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, Wallace's amended complaint is verified (*see* Docket No. 21 at 12), and therefore is considered as part of the evidence in opposition to defendants' motion for summary judgment.

**DISCUSSION**

A.   Claims Against C/O Richards

  1.   Free Exercise Claim

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend I. "The first of the two Clauses, commonly called the Establishment Clause, commands a separation of

church and state. The second, the Free Exercise Clause, requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people." *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). The free exercise right is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security. *See O'Lone v. Shabazz*, 482 U.S. 342, 348-49 (1987). In order to prevail on a free exercise claim, a prisoner must show a defendant burdened the practice of his religion without any justification reasonably related to legitimate penological interests. *See Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008).

The Supreme Court has identified four factors for courts to consider when determining whether a regulation or practice is reasonably related to legitimate penological interests: (1) whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," (2) "whether there are alternative means of exercising the right that remain open to prison inmates," (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) the "absence of ready alternatives," or, in other words, whether the rule at issue is an "exaggerated response to prison concerns." *Turner v. Safley*, 482 U.S. 78, 89-90 (1987) (citation omitted). The task in considering the *Turner* factors is not to balance the four factors, but, rather, to determine whether the state shows a "reasonable" relation between the policy and legitimate penological objectives, rather than simply a "logical" one. *Beard v. Banks*, 548 U.S. 521, 533 (2006). While all justifiable inferences must be drawn in the nonmoving party's favor with respect to matters of disputed fact, the court's inferences must accord deference to the views of prison authorities in disputed matters of professional judgment. *See id.* at 529-30. Unless a prisoner can point to evidence showing the policy is not reasonably related to legitimate penological objectives, sufficient to allow him to prevail on the merits, he cannot prevail at the summary judgment stage. *Id.* at 530.

On the evidence in the record, no rational trier of fact could find in favor of Wallace on his Free Exercise Clause claim. Viewing the evidence in the light most favorable to Wallace, the evidence shows simply that C/O Richards once asked Wallace what his religion was and then at a

later time caused him to be dismissed from his kitchen job.[5]  Wallace has presented no evidence that his dismissal from his kitchen job burdened the practice of his religion.  *See Shakur*, 514 F.3d at 883-84.  He does not provide evidence as to exactly what his religion was (other than that he was not a Muslim or not just a Muslim, *see* Docket No. 34 at 10), has not described the tenets of his religion, and has not shown that having a kitchen job is a practice rooted in his religious belief.

Even if Wallace could show that dismissal from the kitchen job burdened his religious beliefs, the evidence in the record (viewed in the light most favorable to Wallace) shows that C/O Richards' decision passes muster under the *Turner* test.

With respect to the first *Turner* factor, the undisputed evidence shows a rational and valid connection between a legitimate government purpose and C/O Richards' decision to dismiss Wallace from his kitchen job.  Prison security is a compelling government interest, *see Cutter*, 544 U.S. at 725 n.13, and protecting inmate safety is required under the Eighth Amendment, *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  The regulations require inmates to perform assigned tasks "diligently and conscientiously," timely report to their assignments, and perform "their work and program assignments in a safe manner."  Cal. Code Regs. tit. 15, § 3041(c).  C/O Richards presents undisputed evidence that he thought Wallace was doing a poor job and was not completing his tasks in a timely manner.  More significantly, C/O Richards presents undisputed evidence that other inmate-workers had repeatedly complained to him that they had more work because Wallace was not completing his job duties in a timely manner.  C/O Richards was concerned that the other inmates' unhappiness could erupt into violence in the kitchen, where the inmates had ready access to weapons and materials that could be turned into weapons.  The undisputed evidence shows that C/O Richards dismissed Wallace from the kitchen job to promote inmate and institutional safety.

---

[5] Richards argues that he did not actually terminate Wallace from the job and instead only recommended that Wallace be unassigned.  The court disagrees that that technical distinction would absolve Richards of potential liability under § 1983.  Viewing the evidence in the light most favorable to Wallace, Richards' actions in writing the CDC 128-B1 recommending Wallace's unassignment from his job played a direct causal role in Wallace being dismissed from the job, as there is no evidence Wallace would have been unassigned but for that recommendation.  A reasonable trier of fact could conclude that Richards caused Wallace to be dismissed from his job.

United States District Court
Northern District of California

Wallace disagrees with some information in the CDC 128-B1 and with some of Richards' stated reasons for terminating him: First, Wallace states that he was a dining room scullery worker, not a culinary worker. Docket No. 34 at 7-8. This is a distinction without a difference, as he agrees he was on the inmate crew responsible for morning food service in Facility A-3. Second, he states that his job had "nothing to do with" food being prepared on time and that his job could not disrupt programming or operations because he only spray-cleaned pots after the food had been emptied from the pots into the trays for a food service line. Docket No. 34 at 7-8. Although he may not have been cooking or dishing out food, cleaning cooking pots after they are used so that they may be used again plainly is at least indirectly connected to food preparation as well as food safety. He does not state that the pots he was washing were not going to be used again, and it would seem nonsensical to wash pots out if they were only destined to be thrown in the trash. He fails to present evidence that would allow a reasonable trier of fact to conclude that the process of cleaning out pots after food has been served was not related to food preparation or food safety.

As noted earlier, the second *Turner* factor is "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 89-90. There is no evidence that the dismissal of Wallace from his job deprived him of his ability to exercise his religious rights. *See O'Lone*, 482 U.S. at 352-53 (although there were no alternative means for the prisoners on work detail to attend Jumu'ah services, the prisoners nevertheless retained their ability to participate in other Muslim religious ceremonies and practices, and that ability supported the reasonableness of the restriction).

The third *Turner* factor requires the court to consider the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. Even if Wallace had a religious right to a prison job, he does not overcome C/O Richards' evidence that he was perceived to be a lagging worker, that his underperformance was irritating other inmates, and that the irritation increased the potential for an eruption of violence in the kitchen. A violent outburst would have a negative effect on guards and other inmates. This factor weighs in favor of upholding the termination of

the worker perceived to be underperforming.

The fourth *Turner* factor requires the court to consider whether there is an "absence of ready alternatives" to the prison policy. *Turner*, 482 U.S. at 90. The burden is on the prisoner challenging the regulation to show that there are obvious, easy alternatives to the regulation. *See O'Lone*, 482 U.S. at 350; *see also Mauro v. Arpaio*, 188 F.3d 1054, 1063 (9th Cir. 1999). The same safety concern arising from allowing the perceived underperforming worker to remain in his kitchen job also weighs in favor of defendants on the fourth *Turner* factor. Wallace has not shown obvious and easy alternatives to discharging the perceived underperforming worker whose co-workers were irritated with him.

Having considered the various *Turner* factors, the court concludes that C/O Richards' decision to terminate Wallace due to his perceived underperformance that was irritating other inmate-workers on Wallace's team was reasonably related to the legitimate penological interests in staff and inmate safety. Wallace does not show or raise a triable issue of fact that his right to free exercise of religion was improperly impinged upon by C/O Richards. Richards is entitled to judgment in his favor on Wallace's First Amendment claim.

### 2. RLUIPA Claim

The Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, provides that no state may impose a "substantial burden" on an inmate's exercise of religion unless the action or policy in question provides the least restrictive means of serving a compelling governmental interest. 42 U.S.C. § 2000cc-1(a). RLUIPA does not define "substantial burden." *See* 42 U.S.C. § 2000cc-5. The Ninth Circuit, however, has held that a "substantial burden" on "religious exercise" is one that imposes "a *significantly great* restriction or onus upon such exercise." *Hartmann v. California Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1125 (9th Cir. 2013) (emphasis added) (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)). "Religious exercise," for RLUIPA purposes, includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). The exercise of religion may involve not only the belief and profession,

13

but the performance of physical acts such as group assembly for worship.  *See Greene v. Solano County Jail*, 513 F.3d 982, 987 (9th Cir. 2008).

The plaintiff bears the burden of coming forward with evidence demonstrating the state's action or policy constituted a substantial burden on his exercise of religion.  *Warsoldier v. Woodford*, 418 F.3d 989, 994-95 (9th Cir. 2005).  The focus of this initial inquiry necessarily is on the manner in which the plaintiff's religious exercise is impacted, rather than on the reasonableness of the facility's policy or regulation.  *Id.* at 995.  Once the plaintiff has met his initial burden of showing a substantial burden on his exercise of religion, the burden shifts to the government to show that the burden imposed is in furtherance of a "compelling" government interest (rather than simply a legitimate penological interest), and that it achieves the compelling interest by the least restrictive means.  *See* 42 U.S.C. § 2000cc-1(a); *Shakur v. Schriro*, 514 F.3d 878, 889 (9th Cir. 2008).

On the evidence in the record, no rational trier of fact could find in Wallace's favor on an RLUIPA claim because Wallace fails to provide any evidence that his dismissal from his kitchen job substantially burdened his exercise of religion.  *See Warsoldier*, 418 F.3d at 994-95.  Defendant Richards is entitled to judgment as a matter of law on the RLUIPA claim.

3.    Equal Protection Claim

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).  In the prison or jail context, the Equal Protection Clause requires that an inmate who is an adherent of a minority religion be afforded a "reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts," *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (Buddhist inmates must be given opportunity to pursue faith comparable to that given Christian inmates), as long as the inmate's religious needs are balanced against the reasonable penological goals of the prison, *O'Lone*, 482 U.S. at 349.  An inmate cannot prevail on his equal protection claim "if the

difference between the Defendants' treatment of him and their treatment of [other] inmates is 'reasonably related to legitimate penological interests.'" *Shakur*, 514 F.3d at 891 (citations omitted).

To survive summary judgment on his equal protection claim, Wallace must show a triable issue of fact that defendants intentionally treated him differently from similarly situated inmates. *See McCollum v. California Dep't of Corr. and Rehab.*, 647 F.3d 870, 880-81 (9th Cir. 2011) (granting summary judgment for prison officials on Wiccan prison chaplain's equal protection claim where plaintiff-chaplain, among other things, had failed to articulate which clergy were similarly situated to him). Wallace fails to do so.

Wallace states in his verified amended complaint that he was dismissed from his job "because of [his] religious belief." Docket No. 21 at 10. However, he fails to present any evidence to raise a triable issue of fact in support of this conclusory allegation of discrimination against him due to his religion.

There is no evidence that any other similarly situated inmate (i.e.., perceived by C/O Richards to be a poor worker and complained about by fellow workers) was allowed to remain on the kitchen work crew, let alone an inmate with a religion different from Wallace's religion. The mere fact that Wallace reportedly had a religion – which is not well defined, but may have been understood to be Islam – and that he was terminated from the kitchen job does not lead to any reasonable inference that the latter happened because of the former. Nor does his termination from his kitchen job support an inference of intent to discriminate against Wallace because he was a Muslim (or perceived to be a Muslim), especially since the termination decision was in response to his perceived poor job performance and the ill-will it was breeding among his co-workers. *See generally Washington v. Davis*, 426 U.S. 229, 239 (disproportionate impact alone does not establish discriminatory purpose). On the evidence in the record, no reasonable jury could find that C/O Richards terminated Wallace from his kitchen job due to impermissible discriminatory intent against inmates who were Muslim or were perceived to be Muslim.

Finally, even if the termination of Wallace from the kitchen job resulted in unequal treatment of Muslim and other inmates on the kitchen work crew, the decision to terminate him

15

from the kitchen job passes muster under the *Turner* test as explained in Section A.1, above. The same *Turner* analysis that requires rejection of Wallace's free exercise claim requires rejection of his equal protection claim.

Wallace has not raised a triable issue of fact that his right to equal protection was improperly impinged upon by C/O Richards. C/O Richards therefore is entitled to judgment in his favor on Wallace's claim under the Fourteenth Amendment's Equal Protection Clause.

### 4. Qualified Immunity Defense

The defense of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether an official is entitled to qualified immunity, the court must decide whether the facts alleged show the official's conduct violated a constitutional right; and, if so, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Saucier v. Katz*, 533 U.S. 194, 201-02 (2001); *see also Pearson v. Callahan*, 555 U.S. 223 (2009) (overruling *Saucier*'s requirement that qualified immunity analysis proceed in a particular sequence). "[I]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

The court has concluded that the evidence fails to show a violation of Wallace's First or Fourteenth Amendment rights. Therefore, C/O Richards prevails on the first prong of the *Saucier* test. C/O Richards is entitled to qualified immunity against the First and Fourteenth Amendment claims.

The qualified immunity analysis does not apply to the RLUIPA claim because qualified immunity is a protection against damages, and damages are not available under RLUIPA. RLUIPA does not authorize money damages against state officials, regardless of whether they are sued in their official or individual capacities. *See Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015).

B. **Plaintiff Failed To Exhaust Administrative Remedies For His Claims Against Ducart, Ramirez and Gutierrez**

1. Exhaustion Requirements

"No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Ross v. Blake*, 136 S. Ct. 1850, 1856-57 (2016) (mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). All available remedies must be exhausted; those remedies "need not meet federal standards, nor must they be 'plain, speedy, and effective.'" *Porter,* 534 U.S. at 524. Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit. *Id.*; *Booth v. Churner*, 532 U.S. 731, 741 (2001). Section 1997e(a) requires "proper exhaustion" of available administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Proper exhaustion requires using all steps of an administrative process and complying with "deadlines and other critical procedural rules." *Id.* at 90. An inmate "need not exhaust *unavailable* [remedies]." *Ross*, 136 S. Ct. at 1858 (emphasis added). An administrative remedy is unavailable if, for example, "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; or if it is "so opaque that it becomes, practically speaking, incapable of use"; or if "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859–60.

The State of California provides its inmates and parolees the right to appeal administratively "any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare." Cal. Code Regs. tit. 15, § 3084.1(a). In order to exhaust available administrative remedies within this system, a prisoner must proceed through three formal levels of appeal and receive a decision from the Secretary of the California Department of Corrections and Rehabilitation or his designee. *Id.* § 3084.1(b), § 3084.7(d)(3).

The amount of detail in an administrative grievance necessary to properly exhaust a claim is determined by the prison's applicable grievance procedures. *Jones v. Bock*, 549 U.S. 199, 218 (2007); *see also Sapp v. Kimbrell*, 623 F.3d 813, 824 (9th Cir. 2010) ("To provide adequate notice, the prisoner need only provide the level of detail required by the prison's regulations"). California prisoners are required to lodge their administrative complaint on a CDCR 602 form (or a CDCR 602-HC form for a health care matter). The level of specificity required in the appeal is described in a regulation:

> The inmate or parolee shall list all staff member(s) involved and shall describe their involvement in the issue. To assist in the identification of staff members, the inmate or parolee shall include the staff member's last name, first initial, title or position, if known, and the dates of the staff member's involvement in the issue under appeal. If the inmate or parolee does not have the requested identifying information about the staff member(s), he or she shall provide any other available information that would assist the appeals coordinator in making a reasonable attempt to identify the staff member(s) in question. [¶] The inmate or parolee shall state all facts known and available to him/her regarding the issue being appealed at the time of submitting the Inmate/Parolee Appeal form, and if needed, the Inmate/Parolee Appeal Form Attachment.

Cal. Code Regs. tit. 15, § 3084.2(a)(3-4).

Several Ninth Circuit cases have referred to California prisoners' grievance procedures as not specifying the level of detail necessary and instead requiring only that the grievance "describe the problem and the action requested." *See Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (quoting former Cal. Code Regs. tit. 15, § 3084.2); *Sapp*, 623 F.3d at 824 ("California regulations require only that an inmate 'describe the problem and the action requested.' Cal. Code Regs. tit. 15, § 3084.2(a)"); *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) (when prison's procedures do not specify the requisite level of detail, "'a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought'"). Those cases are distinguishable, however, because they did not address the regulation as it existed at the time of the events complained of in Wallace's amended complaint. Section 3084.2 was amended in 2010 (with the 2010 amendments becoming operative on January 28, 2011), and those amendments included the addition of subsection (a)(3). *See* Cal. Code Regs. tit. 15, § 3084.2 (history notes 11-12 providing operative date of amendment). *Wilkerson* and *Sapp* used the pre-2011 version of section 3084.2, as evidenced by their statements that the regulation required the inmate to "describe the problem

18

and the action requested" – a phrase that does not exist in the version of the regulation in effect in and after 2011.  *Griffin* is distinguishable because it discussed the Maricopa County Jail administrative remedies rather than the CDCR's administrative remedies.  Whatever the former requirements may have been in the CDCR and whatever requirements may still exist in other facilities, since January 28, 2011, the operative regulation has required California prisoners using the CDCR's inmate appeal system to list the name(s) of the wrongdoer(s) in their administrative appeals.

Exhaustion of administrative remedies may occur if, despite the inmate's failure to comply with a procedural rule, prison officials ignore the procedural problem and render a decision on the merits of the grievance at each available step of the administrative process.  *Reyes v. Smith*, 810 F.3d 654, 658 (9th Cir. 2016); *e.g., id.* at 659 (although inmate failed to identify the specific doctors, his grievance plainly put prison on notice that he was complaining about the denial of pain medication by the defendant doctors and prison officials easily identified the pain management committee's involvement in the decision-making process).

2.    Analysis

Defendants have moved for summary judgment on the ground that Wallace did not properly exhaust administrative remedies for his claims against defendants Ducart, Ramirez and Gutierrez because he did not file any inmate appeal mentioning any of them that received a decision from the third, or highest, level in the inmate appeals system about these defendants' conduct giving rise to the claims in the amended complaint.[6]  They have demonstrated that the only inmate appeal that Wallace filed about the events giving rise to his amended complaint that received a decision at the third, or highest, level was the inmate appeal against C/O Richards.

Defendants have carried their burden to demonstrate that there were available administrative remedies for Wallace and that Wallace did not properly exhaust those available

---

[6] Defendants do not dispute that administrative remedies were exhausted for the claims against C/O Richards.  The discussion in the text in this section thus applies only to the question of whether administrative remedies were exhausted for the claims against defendants Ducart, Ramirez and Gutierrez.

remedies. The undisputed evidence shows that California provides an administrative remedies system for California prisoners to complain about their conditions of confinement, and that Wallace used that inmate appeal system to complain about some (but not all) events on which the claims in his amended complaint are based. The undisputed evidence also shows that the only inmate appeal filed pertaining to events alleged in the amended complaint that received a decision at the third level did not assert any particular wrongdoing by defendants Ducart, Ramirez or Garcia and did not mention any of them by name or title, even though Wallace was required to do so by the regulation in order to properly exhaust administrative remedies. Cal. Code Regs. tit. 15, § 3084.2(a)(3). As a result of Wallace's failure to adequately identify defendants Ducart, Ramirez or Gutierrez as wrongdoers in that inmate appeal, Wallace did not "provide the level of detail required by the prison's regulations," *Sapp*, 623 F.3d at 824, and therefore did not properly exhaust his administrative remedies against those three defendants. *See Ngo*, 548 U.S. at 90. By failing to provide this information, Wallace failed to provide sufficient information to allow prison officials to take appropriate responsive measures.

The fact that the prison officials resolved the appeal that Wallace had specifically identified as being about C/O Richards firing him from his job does not suggest that prison officials "ignore[d] the procedural problem" of Wallace not identifying other prison officials who may have done something he found objectionable; prison officials had no reason to suspect from the inmate appeal filed that there was a procedural problem of unidentified other wrongdoers. They did not choose to ignore a problem of which they were not made aware. *Cf Reyes*, 810 F.3d at 658 (exhaustion occurred where "prison officials ignore[d] the procedural problem and render[ed] a decision on the merits of the grievance").[7] Defendants have carried their burden to

---

[7]In *Reyes*, the California prisoner whose health care appeal concerning inadequate pain management failed to identify two prison doctors, as required by CDCR's regulation, nevertheless exhausted his claim of deliberate indifference to serious medical needs against the two prison doctor defendants because the appeal was decided on its merits at all levels of review. *See id.* at 656-57. But this does not mean that a claim decided on the merits necessarily exhausts as to all possible defendants. There must be a sufficient connection between the claim in the appeal and the unidentified defendant(s) to provide prison officials with "notice of the alleged deprivation" and an "opportunity to resolve it." *Id.* at 659. In *Reyes*, the two unidentified prison doctors had a sufficient connection with plaintiff's claim in the appeal concerning inadequate pain management

show that Wallace did not properly exhaust his administrative remedies for his claims against defendants Ducart, Ramirez and Gutierrez.

Once defendants met their initial burden, the burden shifted to Wallace to come forward with evidence showing that something in his particular case made the existing administrative remedies effectively unavailable to him. *See Albino*, 747 F.3d at 1172. Wallace has made no such showing. Wallace argues that he "did not have the full names of all the officers who harassed [him] which is why [he] put et. al P.B.S.P. staff and not just simply F. Richards." Docket No. 34 at 11. But his inmate appeal was very nonspecific as to who did what, and his inmate appeal also did not provide any information that would allow prison officials to determine who these unidentified persons were. *See* Cal. Code Regs. tit. 15, § 3084.2(a)(3). A reasonable person reading his inmate appeal would not have understood that Wallace also intended it to complain about the conduct of prison officials other than C/O Richards. Indeed, the first-level response specifically stated that the issue raised by Wallace's inmate appeal was that C/O Richards "has not called you into work. All issues unrelated to the allegation of staff misconduct must be appealed separately and will not be addressed in this response." Docket No. 21 at 26. The inmate appeal response further informed Wallace that he could request staff assistance if he was unable to learn the name of involved staff. There is no evidence that he sought staff assistance in learning the name(s) of involved staff or that he made any effort to submit new inmate appeals about the unnamed staff. Wallace has not met his burden to show that administrative remedies were effectively unavailable to him.

Wallace failed to properly exhaust his administrative remedies as to defendants Ducart, Ramirez and Gutierrez because he did not name them in his inmate appeal or specifically describe their alleged wrongdoing. *See Ngo*, 548 U.S. at 90-91 ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.");

---

because prison officials plainly knew that the two unidentified prison doctors served on the pain management committee that had determined that plaintiff should not receive narcotic pain medication. *See id.*

*see, e.g. Parks v. Chappell*, 2015 WL 3466280 (N.D. Cal. 2015) (Chen, J.) (granting summary judgment in warden's favor because inmate appeal about injury-causing event did not mention warden by name or title); *Martinez v. Swift*, 2015 WL 1349525, *2 (N.D. Cal. 2015) (Seeborg, J.) (granting summary judgment for nonexhaustion because the grievance "does not mention [defendant], or describe with any specificity his actions or words" and therefore did not comply with § 3084.2(a)(3)); *Panah v. State of Cal. Dep't of Corr. and Rehabilitation*, 2015 WL 1263494, *9-*10 (N.D. Cal. 2015) (Freeman, J.) (even if plaintiff's failure to pursue inmate appeal to highest level is excused, he failed to properly exhaust his claim against the warden because his inmate appeal did not name the warden or describe the basis for his liability); *Gray v. Smith*, 2015 WL 875482, *2-*3 (N.D. Cal. 2015) (Alsup, J.) (granting summary judgment for nonexhaustion where inmate appeal described an incident at the prison but did not name the warden and did not describe a widespread practice or that the warden knew of the incident and failed to stop it).

Bearing in mind that defendants have the ultimate burden of proof on the defense and viewing the evidence in the light most favorable to Wallace, the court concludes that defendants Ducart, Ramirez and Gutierrez are entitled to judgment as a matter of law on the affirmative defense that Wallace failed to exhaust administrative remedies for his § 1983 claims against them.

Due to the differences between the unexhausted claims and the exhausted claims, the unexhausted claims can be dismissed while the exhausted claims against C/O Richards can proceed to a resolution on the merits. That is, the entire action need not be dismissed based on the nonexhaustion of the claims against three of the four defendants. *See Jones v. Bock*, 549 U.S. 199, 222-24 (2007) (rejecting "total exhaustion-dismissal" rule); *Lira v. Herrera*, 427 F.3d 1164, 1175 (9th Cir. 2005). The claims against defendants Ducart, Ramirez and Gutierrez are therefore dismissed without prejudice to Wallace filing a new action alleging those claims if he ever properly exhausts his administrative remedies.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. (Docket No. 33.) The action against defendants Ducart, Ramirez and Gutierrez is dismissed

without prejudice due to plaintiff's failure to exhaust administrative remedies before filing this action. Defendant Richards is entitled to judgment as a matter of law in his favor on the merits of Wallace's claims and on the defense of qualified immunity.

The clerk shall close the file.

**IT IS SO ORDERED**.

Dated: August 24, 2018

_____
SUSAN ILLSTON
United States District Judge